IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2017

## PRISCILLA BROOKE WILSON v. PATRICK SHANE PHILLIPS

Appeal from the Circuit Court for Marion County
No. 16894     J. Curtis Smith, Judge

_____

### No. M2017-00097-COA-R3-CV

_____

The trial court denied mother's petition to make her the primary residential parent of the parties' three children. Based upon this court's review of the facts, we have concluded that the trial court erred in assessing the best interest of the children and reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and KENNY W. ARMSTRONG, JJ., joined.

Kathryn R. Leiderman, Jasper, Tennessee, for the appellant, Priscilla Brooke Wilson.

Jerry B. Bible, Jasper, Tennessee, for the appellee, Patrick Shane Phillips.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Patrick Shane Phillips ("Father") and Priscilla Brooke Wilson ("Mother") are the parents of three children, Candace Amaya Phillips (born September 2003), Kendyl Mariah Phillips (born April 2005), and Kamryn Layla Phillips (born April 2005). Father filed for divorce in August 2006 and obtained a default judgment on May 1, 2007. In the final decree of divorce entered on May 1, 2007, the trial court granted Father a divorce on grounds of inappropriate marital conduct and abandonment, awarded him primary custody of the three minor children, and incorporated the Father's proposed parenting plan, pursuant to which Mother had 125 days of parenting time per year. Mother had parenting time with the children the last full week of each month from Sunday at six p.m. until the following Sunday at six p.m. Mother also had the children during the months of

June and July, with the exception of the third full week. Mother was ordered to pay child support in the amount of $75.01 per week. The plan provided for joint decision-making.

In November 2009, the court entered a modified parenting plan reflecting an agreement of the parties. Under the new parenting plan, Mother had 107 days of parenting time per year. She had parenting time with the children every week from Friday at 2:00 p.m. until Monday at 7:30 a.m. When school was not in session, Mother had the children from Friday at 6:00 p.m. until Sunday at 6:00 p.m. Father had the children the first full weekend each month. Mother was to pay $515.00 per month in child support.

In December 2011, Father filed a petition for contempt and to modify the parenting plan. Mother filed a response and counter-petition. In an order entered on August 15, 2012, the trial court found that "the proof was evenly divided between the parties" and that the evidence did not support any change to the existing order. As to Father's allegations that Mother was in arrears on child support and had failed to pay her portion of medical bills, the court found that "the proof was not sufficient to support [Father's] allegations."

Mother filed the petition at issue in this appeal on June 28, 2016. In her petition, Mother sought a finding of contempt, a modification of custody, and a restraining order. Mother alleged that Father was in contempt of the November 5, 2009 permanent parenting plan for "making unilateral decisions regarding the children's non-emergency healthcare, religious upbringing, and extracurricular activities," "fail[ing] and refus[ing] to provide [Mother] with a copy of his health insurance card for the children," and "intentionally violat[ing] [Mother's] rights set forth in T.C.A. § 36-6-101, including, specifically, subsections (1), (5), (6), (7), (8), and (9)." Mother alleged the following substantial and material changes of circumstances which justified a modification of the primary residential parent and the parenting schedule:

(a) [Mother] has remarried and now lives in Dade County, Georgia;
(b) The children have a close and loving relationship with [Mother's] spouse/their step-father and his children;
(c) Both [Mother's] and [Father's] work schedules have changed. As a result of [Father's] work schedule the minor children spend much of their time in the care of their step-mother;
(d) The minor children are now going through puberty;
(e) [Father] and his wife are mentally and physically abusive to the children;
(f) [Father] does not adequately or properly attend to the children's medical needs;
(g) The oldest child's grades have suffered; and

(h) [Father] and his current wife frequently yell and fight with each other in the presence of the children.

Mother requested a restraining order based upon allegations of mental and physical abuse of the children by Father and his wife, "including, slapping, choking, jabbing in the throat, unjustified and excessive spanking, downgrading the children, making derogatory remarks about [Mother] to the children, and using profane names in reference to the children's extended family."

Father filed an answer and counter-petition to modify. He included an application for a restraining order against Mother with a verbatim restatement of the allegations contained in Mother's application for a restraining order. After a hearing on July 5, 2016, the trial court entered restraining orders against both Mother and Father. The orders include the following language: "[Mother/Father] is hereby restrained and enjoined from discussing these proceedings with the minor children and from permitting [her husband/his wife] doing so."

The trial of this matter took place over three days in July and August 2016. The court heard testimony from Mother, Father, the children's stepfather, their paternal grandmother, and the children, Amaya, Kamryn, and Kendyl.

Testimony of witnesses

1. Mother

Mother testified that Amaya was almost thirteen years old, and Kamryn and Kendyl were eleven. Mother was married to Kevin Wilson ("Stepfather"), who had two daughters of his own. She testified that their relationship began with a few dates in December 2012. Mother and Stepfather resided in Trenton, Georgia.

Mother stated that, at the time of the last modification hearing, in August 2012, she and her previous husband, Mr. Reed, lived in Chattanooga and were still together. According to Mother, Father's attorney asked her at that hearing about her relationship with the children, about Mr. Reed's relationship with the children, and about whether she and Mr. Reed were getting along. Mother testified that, at the time of the hearing, she and Mr. Reed "were getting along okay." She stated that Mr. Reed had trouble handling the conflicts between Mother and Father and withdrew from Mother during the hearing. After the hearing, Mr. Reed moved out and filed for divorce based on irreconcilable differences. Mother was awarded the house,[1] which was encumbered by debt, and she declared bankruptcy in 2013. Mother testified that she "had a substantial amount of identity theft on my credit from my mother and from credit cards that she had taken out."

---

[1] On cross-examination, Mother testified that the house that she and Mr. Reed lived in was in her name.

She further stated that the house had more debt on it that it was worth because of declining home values in the neighborhood.

Mother introduced photographs of her home with Stepfather. They lived in a four-bedroom home with two bathrooms on a one-acre lot. Kamryn and Kendyl shared a bedroom; Amaya shared a bedroom with her stepsister, Alyssa.

At the time of the 2012 hearing, Mother was employed at U.S. Xpress in Chattanooga, where she worked from January 2008 through March 2014. Her hours were from 7:00 a.m to 4:00 p.m. or 8:00 a.m. to 5:00 p.m. at the office, with no flexibility to work at home. Mother stated that she left that job because the company wanted to change her work shift so that she worked more hours, and Mother wanted to have more time to spend with her children. Mother then became an independent contractor for UTi Transportation, a job that allowed her to work from home and gave her greater flexibility. The job did not pay as well as advertised, and Mother left UTi in June 2015. She then began working as a commercial account manager for Orkin Pest Control in July 2015, a salaried position that also paid commissions. Mother had a scheduled office meeting from eight to nine on Monday morning; otherwise, she worked from home and scheduled on-site inspections with potential customers.

Mother testified that Father's work schedule had changed. He was no longer available during the day, and his wife, Sonia Phillips ("Stepmother"), also worked during the day. When the children were not in school, they were cared for during the workday by Stepmother's mother or Father's mother. Mother asked to be able to care for them, but she had only been allowed to have parenting time with the children once during the workweek.

Mother testified that her three girls were "very fond" of Stepfather and his two daughters, Alyssa and Kylee. Mother stated:

> The girls [Amaya, Kamryn, and Kendyl] go to [Stepfather] a lot to learn new things. They ask him how to do things. For example, they asked [Stepfather] about swimming. [Stepfather] taught them how to swim. Bikes, riding bikes, they asked him about that. He taught them that. Kamryn is currently learning how to play the keyboard, and he is teaching her how to do that. He also assists them with softball all of the time at our house.

Mother further testified that Kylee was seventeen and Alyssa had just turned twelve years old at the time of the hearing. Alyssa and the twins were going into the sixth grade. Mother described the relationship among the children:

They play actively all the time. Kamryn and Alyssa at times—they're siblings, so they play hard, and sometimes they don't want to speak. But Kendyl and Alyssa are inseparable at my house. If I've got a child in a room, the other one is right beside her. And then Amaya and Kylee are very attached to each other. Amaya talks to Kylee a lot.

Mother stated that the children fought like typical siblings.

Mother described the family activities they did together:

Together we go and we practice softball at Jenkins field, which are the softball fields that are near our house. We ride bikes near our house. The girls all have a bike. We also go to the movies at least once per summer. We all take a movie trip together. We go out to eat together. We cook meals at home and eat dinner at home together. The girls do crafts frequently at home. Amaya paints. I help her with that. Kamryn is learning the keyboard. [Stepfather] helps her with that. Kendyl has a large interest in catching softball, and Kendyl and Alyssa work together for softball, even in our front yard, with [Stepfather] because Alyssa pitches. We have—there's just so much. We have family movie nights. The girls just sit in our living room and we chitchat. . . . We do so many activities together that it's really hard to list. Once per month we do go visit [Stepfather's] relatives . . . so that they can stay in touch with their new cousins that they fostered a large relationship with.

Mother stated that "the girls," Amaya, Kendyl, and Kamryn, historically had "great grades," but that Amaya went through a period earlier in 2016 when she was concerned about her language arts grades. Amaya spoke to Mother, reported that she had two failing grades in language arts on a certain assignment, and Mother advised her to talk to the teacher about allowing her to redo the assignment. Amaya was able to replace the grades. She was also concerned about her math grades and asked to be able to attend some free after-school tutoring. Without consulting Mother, Father refused to allow Amaya to attend. Mother testified that she attempted to discuss the tutoring with Father at a softball game, but he did not acknowledge her.

Asked what happened when she attempted to call the girls when they were with Father, Mother testified as follows:

Either the phone is not answered; or if I do get to speak with the girls, they are placed on speakerphone. They let me know that they are on speakerphone; or they are made to stay close by, and I can hear outside them being told that they have to stay close by. The phone conversations are also cut short. They're told that they have to go because they have to

- 5 -

do homework or because they have to take a shower.  It doesn't matter what time I call.  There's always a reason they're cut short.

According to Mother, the phone call monitoring had gotten worse since 2012.  She stated that, due to Father's work schedule, most of the phone interactions had to be done through Stepmother, "and in that matter it's gotten a lot worse."  Previously, Amaya had been able to communicate with Mother by Facetime on her iPad Touch.  Mother stated that Amaya no longer had this capability.

With respect to the children's extracurricular activities, Mother testified that Father did not involve her in the decision-making.  Rather, she stated, Father and Stepmother made the decisions.  They decided whether and when the girls would play a sport.  Mother asked if she could take the girls to and from softball practice and games that year, but she was only allowed to do so one time during the season.  She testified: "I would arrive at games and find out that someone outside of [Father and Stepmother] had taken the girls to games at times, and I was not asked."  Mother testified that, from 2012 until the hearing, she was not consulted about decisions as to whether the girls were going to play a particular sport.  When Father or Stepmother signed the girls up at the beginning of the season, they would not put her contact information on the sign-up sheets.  Mother attended all but one of the girls' soccer games and softball games; she reported that Father attended few of Amaya's and Kendyl's softball games, and not more than two soccer games during the season.

Mother testified that she "received very few communications about school activities."  Father failed to inform Mother of events such as "academy receptions, plays that have happened during the school day, any reports that the children have presented in front of the classroom where parents are invited, [and] family reading nights."  She only learned of these events after the fact.

Mother testified that Father did not notify her of the children's medical appointments.  She asked Father to allow her to take them to the doctor, to be allowed to be present, or to be advised of appointments.  Mother either got "no response at all" from Father or he told her that she could not be present.  For example, when Amaya was scheduled to have a root canal, Father told Mother that she could not be there because "only two parents were allowed, and . . . [Stepmother] was going to go."  Mother asked again if she could be present, and Father said, "okay, fine, you take her."  Mother agreed, but Father later changed his mind and would not allow Mother to be there because Stepmother wanted to be there.  Mother went to the appointment anyway:

I went to the dentist visit.  Amaya did not even know I was there.  She wasn't allowed to come near me.  I was boxed out.  When the nurse said that two parents could go back, [Father] and [Stepmother] went back, and [Stepmother] cried.  And [Father] boxed me out so that I could not go back.

Amaya did not know I was there at all. The only thing that I could do was provide my insurance and payment.

Mother further testified that Father's attitude regarding medical appointments was that, if it was not Mother's parenting time, she was not allowed to go. She was not informed of medical appointments until after they occurred. After requesting and reviewing the girls' medical records (submitted as exhibits at trial), Mother learned that all three had been given the HPV vaccine. She had not been consulted about this decision.

The pediatrician's office notes refer to Stepmother as "mother" when she acted as the "historian" at office visits. In the patient registration records of Kamryn's dentist, Dr. Karim Hasnani, Stepmother signed as "patient, parent or guardian." Mother's name was not listed anywhere in the registration information. Stepmother completed the registration forms at the office of dentist Dr. Clay Goins in September 2012 and signed as "parent/guardian." She listed Mother's name, but she did not include any contact information. Stepmother also signed a "Consent for Treatment" form on behalf of Amaya.

Mother expressed concern that Father did not take care of the children's medical needs, a concern that she did not have at the time of the hearing in 2012. Father did not take the children for regular dental cleanings. He did not take Kamryn for her regular six-month cleaning after she had a tooth repaired in November 2015. The dentist's notes state that Kamryn had "heavy calcium on lower anteriors with severe gingivitis." Mother was not advised of the dentist's recommendations regarding brushing and flossing. Amaya last had a dental appointment in April 2014 with Dr. Goins. Mother testified that "Amaya has a large gap between her two front teeth on top." Because of this gap, Mother felt that Amaya needed braces. Amaya was self-conscious and insecure about her teeth.

When Mother tried to talk to Father about these issues or other medical concerns, he responded with "blank stares or scoffs." Because she did not have the children with her during the week, it was difficult for Mother to make medical appointments for them, but she did find a dentist who would do cleanings on Saturdays. Mother stated: "I'm frequently told no about keeping or seeing or taking the girls places unless it is, and I quote, my parenting time."

With respect to the girls' vision, Mother testified that Amaya started wearing reading glasses in elementary school. Father did not allow her to bring her glasses to Mother's home. Amaya's glasses broke, but Mother did not know at the time when this occurred. Father did not replace the glasses. The glasses broke when Amaya was in fifth grade, a little over two years before the hearing. Mother tried to talk to Father about Amaya's glasses, but she "was met again with blank stares and walking off." When she

- 7 -

did not get a response from Father, Mother would also try to talk to Stepmother, who was usually also nonresponsive. So, Mother took all three girls to have eye exams one weekend. She noted that Amaya had frequent headaches and that Kamryn complained of headaches and of having to be moved forward at school. Kamryn and Amaya were both given prescriptions for glasses, Kamryn's for distance and Amaya's for reading. Mother bought them both glasses. Father never responded to Mother's request to pay his share of the cost.

Another medical issue of concern to Mother was acne on Amaya's face and back. This condition caused pain and self-consciousness for Amaya. Mother tried to speak to Father about Amaya seeing a dermatologist. She also purchased over-the-counter medications for Amaya's acne, but Father would not allow Amaya to use the medications at his house. Father would not cooperate with Mother about taking Amaya to a dermatologist.

Mother testified that the only time she saw the children's report cards was "if the girls happen to get them on a day that I pick them up." Otherwise, she would have to go to the central office to get their grades. Mother requested the girls' school records and received them for the years 2012 through 2015. The custodial information shows Father and Stepmother. Mother's name and phone number do not appear anywhere on the school forms. Father did not produce any document showing that Mother was listed anywhere on the school records. Mother testified that she was not notified in October 2015 or March 2015 of parent-teacher conferences. Amaya was not permitted by Father to go on a Beta Club trip in the current school year; Father did not consult Mother about this decision, and she did not learn about the trip until the day of the trip. The twins went on a Beta Club trip earlier in the year that Mother did not know about until after the fact. Parents were permitted to go on these trips, and Mother testified that she would have participated had she been aware of the trips.

Asked about changes she had noticed in the children, Mother stated that Kamryn "has become very anxious" and "is becoming very withdrawn." Mother observed that Kamryn would shake and cry when talking about things that worried her, and that she would sometimes put her hand over her face (giving the appearance, to Mother, that she thought she was going to be hit). Kamryn would talk to Mother about things that happened at Father's house when she would shake and cry. Mother believed that Kamryn and Amaya needed to see a therapist. These incidents had gotten worse over the past year and had been "nearly constant" over the prior six months.

Mother described an incident when Kamryn awoke in the middle of the night and came upstairs to Mother's bedroom crying and shaking over concerns about the smoke detectors. Mother contacted Father and asked about the smoke detectors at his house; she received no response.

Halloween was problematic for the family. Mother sent Halloween costumes to the school for the three girls to wear trick-or-treating. The girls had picked them out themselves. Kendyl was going to wear a homemade "minion" costume, with face and body makeup she had chosen herself. According to Mother's testimony, when she picked the girls up from school on Friday, Kendyl was crying. Her costume had been altered, and the makeup was unopened. Kendyl was wearing different makeup, which was hard to remove and stained her skin for several days.

Mother purchased the twins dresses for their fourth-grade homecoming, but the dresses were returned to her from Father's house. The girls did not wear them to homecoming. Mother testified that the girls were crying when they brought back the dresses.

Mother testified that, since 2012, the girls' attitudes about returning to Father's house after being with her over the weekend had changed. She had to coax them to leave her house; they would cry and hide and find ways to delay leaving. She recalled a recent time when she took the girls back and they saw that Father's car was not there. The girls were crying and did not want to go back; they got out of the car with some coaxing, went to the door, and then turned around and came back to the car. They sat in the car and talked and Mother calmed them down. After more coaxing, the girls finally got out and went in the house.

Mother testified that she had talked to Father about how the girls were treated at his house as compared to the other children, how they were treated by Stepmother, and how they were disciplined. She asked him to stop hitting them. Father responded that the girls were exaggerating. Mother testified, "I've been ignored or scoffed at or walked away from."

On cross-examination, Mother testified that, when discipline was necessary, the children were "either grounded or a privilege is taken away, or they have a lengthy discussion if it's something minor about what happened, how to fix it, how to keep it from happening again." Mother did most of the disciplining of the girls when they were with her; Stepfather "had a couple of discussions with the girls, but that's it." Mother testified that Alyssa had "received a couple of spankings from [Stepfather]. He does not spank my children at all." For the most part, Mother stated, the children were disciplined the same. She testified that they were all treated equally in her house.

2. Amaya

The parties' oldest child, Amaya, testified[2] that she would be thirteen in September of that year. She lived primarily with Father and Stepmother.

---

[2] At Father's insistence, the parents were present for the children's testimony.

Amaya testified that, just a few days before the hearing, Father and Stepmother told the three girls that Father and Stepmother "could get taken away to jail or Brionna and Zander [their stepsiblings] could get taken away, and like the reason we are in court right now is because we stir the pot."[3] The incident started when Kamryn pulled a wire out of Stepmother's bathing suit and Stepmother got mad; the girls told their grandmother that Stepmother got mad at them, and Stepmother found out that they had talked to their grandmother. This prompted Stepmother to talk to the girls about stirring the pot and to blame them for the current situation. After the July 5 court date (when the parties were instructed not to talk to the children about the case), Amaya heard Stepmother ask Kendyl and Kamryn, "Are you scared of me?"

Asked how she was disciplined at their home, Amaya stated that she was usually spanked or grounded. When the children "back talked," Father and Stepmother would "pop" the children in the mouth. This had occurred in the last four years. If Father or Stepmother felt that a child was not listening, he or she would tilt the child's head up with their index finger and thumb. Amaya testified that this tilting action was uncomfortable. When they administered a spanking, Father and Stepmother used, "switches, flyswatters, belts, hands, and if somebody is doing our—if, like, [Stepmother] is doing our hair and she has a hairbrush in her hand, she'll smack us with a hairbrush." They hit the children from the top of the thigh down the leg.

Amaya recalled an incident during the past school year when she and Kendyl were arguing in Amaya's room and Stepmother overheard them. Stepmother kicked the door open. Amaya was standing behind the door; the door hit her and left a red mark on her back. Stepmother said: "I told you to stop arguing. I didn't kick you that hard, you little baby. Stop crying." She did not apologize. The incident left a hole in the door.

There was an incident where Stepmother threw the dog out on the porch in his kennel while the three girls were watching. Amaya stated that the dog "limped for a little bit," "like he wouldn't step on [his front paw]" after this happened.

Amaya testified that Father stated that the girls could call Mother anytime, "but when it comes down to it, we don't really call her in the end." Amaya stated that, in reality, Father would "put us off until later, but then it never happens." When Mother would call the girls, Father or Stepmother would be in the same room "most of the time." Amaya had been able to communicate with Mother using iMessage and FaceTime, but Father and Stepmother discontinued the internet service after Amaya got angry with Stepmother (because she threw the dog out on the porch) and told Mother over iMessage with words and emojis.

---

[3] Although Amaya initially attributed these statements to Father and Stepmother, her later explanation suggests that it was Stepmother who made the statements.

- 10 -

Amaya stated that she wanted to try out for "ball" the preceding fall and had asked Father and Stepmother. They would not allow it. Stepmother told her that they were going to see Stepmother's father in Florida and that Amaya "wasn't even that good anyways." Zander played football that fall, but the three girls were not allowed to play any sports that fall.

According to Amaya, she had watched horror movies at Father's house a couple of times. When she was too afraid to make it through the entire movie, Stepmother called her a "chicken."

Father and Stepmother would comment to Amaya that Mother did not pay for anything for her.

Amaya testified that she had worn glasses for reading since the fourth grade. The summer after her fifth-grade year, her little brother broke her glasses. Mother replaced her glasses the month of the hearing. When Amaya tried to talk to her Father about replacing her glasses over the intervening two years, he would say, "We'll get them later." Amaya stated that not having her glasses affected her at school. When she had her old glasses, Father did not allow her to take them to Mother's house during the summer. When she went to Mother's house over the weekend, she would leave them in her backpack. With her new glasses, Mother allowed Amaya to take them to Father's house.

Amaya stated that she generally had excellent grades but that her grades had dropped during the past year, which was a concern for her. She specifically had problems with her grades in history and math. She made a 70 on a history paper. Amaya testified that Father and Stepmother did not help her with her homework. After Mother saw her progress report, Amaya told her why her grades had dropped. Mother suggested that Amaya talk to her teacher and see if Amaya could redo the paper and "make up like some stuff that I didn't do quite well." Amaya talked to her teacher and she was able to replace the low grades. With math, Amaya stated that she was having "a hard time understanding some stuff" and her grades kept dropping. The school provided free tutoring to study for the TCAP, which included math tutoring, but Father would not allow Kendyl to attend the tutoring, so Amaya did not ask.

Amaya testified that Stepmother referred to the girls' stepsister Alyssa (Mother's stepdaughter) as a "bitch." Stepmother told the girls that they should support their "real sister" by going to her ballgames rather than going to Alyssa's softball games. Amaya testified that she wanted to alternate and go to all of her sisters' ballgames, but she did not say this to Stepmother.

Amaya testified that, when Father was not in the car and she and Kamryn wore their new glasses home from Mother's house, Stepmother told them she did not like their

glasses. Specifically, she told them both that their glasses were "ugly." Amaya said this made her feel sad because she really liked the glasses. She said to Stepmother that the new glasses "were better than the ones I had last time because my last ones were kiddish. And [Stepmother's] like, oh, because your mom bought them for you and we bought the last ones."

The following line of questioning took place regarding the children's care during the work week:

Q. Is your dad home a lot or is he gone quite a bit?
A. He's at work most during the week.
Q. Okay. And then who—does [Stepmother] work?
A. Yes, [Stepmother] works.
Q. Okay. So who keeps you girls when he and [Stepmother] are at work?
A. [Stepmother's] mom until like 12:00 in the afternoon.
Q. Like lunchtime?
A. Yeah. And then our nana comes, which is our dad's mom, until [Stepmother] gets off of work.
Q. Does [Stepmother's] mother treat you well?
A. She treats Brionna better than—Brionna and Zander better than us, but otherwise she treats me okay.
Q. When you say she treats Brionna and Zander better than y'all, are you talking about you, Kamryn, and Kendyl?
A. Yeah.
Q. And they are her biological grandchildren?
A. Yes.
Q. Okay. Does [Stepmother's] mother smoke?
A. Yes.
Q. Does she smoke in your presence?
A. Yes.
Q. Does she have any difficulties getting around?
A. Yes.
Q. What are those?
A. Like she can barely walk.
Q. Does she have any walking aids or does she just walk—like a cane or—
A. A cane.
Q. When she's keeping y'all, who's caring for the younger children?
A. She is usually watching them and tells them no, and then I'm usually the one holding them back off of something.
Q. What do you mean by that?
A. Like Zander will be trying to get into the refrigerator but he's not supposed to, and I'll just sit him back down on the couch.

Q. I'm not sure if Judge Smith knows because I don't know if we've talked about that. How old are Brionna and Zander?
A. Brionna is 6—
Q. Brionna. Sorry.
A. –and Zander is—I can't remember. I think Zander is 5. I can't remember. I get mixed up with their ages.
Q. Are they calm or rambunctious kids?
A. Zander is wild.
Q. Is [Stepmother's] mother the one that's there in the afternoon or your nana is in the afternoon?
A. My nana comes by 12:00.
Q. So in the morning when she's there, you said, if I understand you right, that you're primarily the one that's caring for Zander and Brionna, making sure Zander is staying out of stuff, not in trouble?
A. Yes, I guess.

Amaya further testified about medical issues. She had chronic problems with acne on her face, back, and sometimes on her neckline and had tried different over-the-counter remedies without success. She wanted to see a dermatologist, and Mother wanted to take her to a dermatologist. Amaya stated that "it was a long time ago" when she last had her teeth cleaned by a dentist; she estimated it was around Easter 2015 with Dr. Clay Goins.

Amaya stated that she had a good relationship with Stepfather. He participated in activities with the girls and taught them skills in softball, biking, and swimming. Stepfather would discipline them by sitting them down and talking "forever." He would explain what they had done wrong and how to do better. Amaya stated that neither Mother nor Stepfather whipped her or smacked her. She stated that she sometimes argued with Alyssa. She had friends in Mother and Stepfather's neighborhood and on Stepfather's softball team. Amaya stated that she "wouldn't mind that much" if she changed schools and enrolled in Dade County.

According to Amaya's testimony, Stepmother said that Kendyl and Kamryn's room at Mother's house (which is in the basement) "wasn't technically a bedroom because it had no windows, that they couldn't, like, escape in case of a fire." Amaya stated that there is a door near the twins' room.

The following testimony took place regarding the possibility of Amaya (and her sisters) living with Mother:

Q. Have you had any conversations with your mother about needing to live with her?
A. Yes.
Q. What have you said to her?

- 13 -

A.  She asked if I wanted to come live there.
Q.  Was that last year, this year?
A.  Last year.
Q.  Okay.  Have you talked to her about what you wanted to do?  Have you asked her about moving in with her?
A.  I asked her like, what if, like hypothetically.
Q.  And why did you do that?
A.  Because I thought it wouldn't ever happen.
Q.  Why didn't you think it would happen?
A.  Because.
Q.  Are you afraid to tell me?
A.  Yes.
Q.  Do you think your dad wouldn't ever let you?
A.  Yeah.
Q.   If the Court determines that that's what you should do, do you want to go live with your mom?
A.  (Witness moves head up and down.)
Q.  Okay.  Can you answer out loud for the court reporter?  You can say it lightly, but turn toward the judge.
A.  Yes.

On cross-examination, counsel for Father questioned Amaya concerning how many times she met with counsel for Mother prior to the hearing.  Amaya stated that she met with Mother's attorney twice and that they went over the questions the attorney would ask her at the hearing.

Amaya acknowledged that Kendyl did not like the bed she slept on at Mother's house because it was "springy."

Amaya testified that she ended the last school year with a 91 point something grade point average, about the same as in past years.

 2.  Kamryn

Kamryn, age eleven, was the next to testify.  She stated that, since the hearing on July 5, Stepmother "was telling us what could happen, like they could—[Stepmother] and [Father] could get thrown in jail and that somebody could take Brionna or Zander away." Kamryn testified that, the night they left court on July 5, Father asked if she was scared of Father and Stepmother.

When asked about discipline, Kamryn stated that, at Mother and Stepfather's house, "usually I get grounded."  With Father and Stepmother, she would get grounded or spanked.  When they spanked her, they would use a flyswatter, a belt, their hand, a

hairbrush, or a switch. Kamryn stated that Stepmother had smacked her in the face once. Sometimes Father would jerk her arm to get her attention. Sometimes he would grab her chin and jerk it up.

The following testimony also occurred concerning Father's and Stepmother's discipline:

Q. What does your dad—what, if anything, has your dad said about spanking you or hitting you?
A. One time he said that that's nothing. You should have seen what my dad did to me.
Q. What, if anything—well, when you get spanked, do you cry?
A. Yes.
Q. What, if anything, does your dad say when you're crying when you're getting spanked or what does he do?
A. He'll say, Do you want something to whine about? I'll give you something to whine about.
Q. If you—when you cry, does he spank you less or spank you harder, or the same?
A. The same.
Q. Does he ever continue spanking you until you stop crying?
A. No.
. . . .
Q. Have you ever been knocked out of a chair?
A. Once by [Stepmother].
Q. And when was—well, were you getting in trouble or what happened?
A. I got in trouble. She said I made a face at her.

Kamryn corroborated Amaya's testimony about the incident when Stepmother kicked the bedroom door and hit Amaya with it.

Kamryn stated that Mother bought her (and her twin sister) dresses for the homecoming dance but Stepmother would not allow them to wear the dresses. Stepmother told Kamryn that Mother did not pay for anything. Kamryn testified that Stepmother called Alyssa a brat and a bitch. She also stated that Stepmother told her: "You should be going to your real sister's game, not your stepsister's."

At Mother's house, the children watched funny movies and family movies, not horror movies. They watched horror movies at Father's house.

On May 27, 2016, Stepmother told Kamryn that [Stepmother] had been a good kid and got to do things because she was mature. This was all that she said, but Kamryn

- 15 -

understood that Stepmother was telling her that she was not a good kid. Kamryn felt afraid when Stepmother was talking to her.

Kamryn testified that, when Father and Stepmother took the family to White Water in 2016, "[Stepmother] tried to smack my mouth. She thought I was having an attitude with her, and she poked me in my eye." The girls went on vacation with Mother in the summer of 2016. Father threatened that Kamryn would not be allowed to go because of her attitude.

Kamryn stated that Mother had knee replacement surgery that summer. She asked to go visit Mother after she had the surgery, but Father refused to let her go. Amaya had gone to a friend's house, and Father said that he wanted to spend time with Kamryn. She asked to be able to call Mother, but Father did not allow her to call either.

When Kamryn got her new glasses three or four weeks prior to the hearing, Stepmother told her they were ugly. When Mother took Kamryn to get her hair cut, Kamryn was worried that Stepmother would be angry. Kendyl told Stepmother that Kamryn wanted her hair a little shorter. Stepmother said: "Well, I might as well just call you a boy because you want it so short."

Kamryn stated that Stepmother's mother treated Brionna better than her and her sisters. More than once, she had blamed them for something they did not do. Then, they would get in trouble with Stepmother. They would try to tell Stepmother that it was not them, but she would not listen. According to Kamryn, Stepmother treated Brionna and Zander "a little better" than Kamryn and her sisters.

Kamryn testified that Stepmother called her room at Mother's house "a dungeon" because it was in the basement and had no windows. Kamryn did not feel like the room was a dungeon.

Kamryn stated that Stepfather taught her and her sisters to ride bikes and helped them with their swimming. She had relatives who went to school in Dade County, where Mother and Stepfather lived. The trial court did not allow Kamryn to testify about which parent she would like to live with.

The girls were allowed to call Mother anytime they wanted to, and Father and Stepmother were not usually in the room, according to Kamryn. Kamryn testified that Stepmother told Kamryn that her hair was greasy and that Stepmother was going to shave it.

On cross-examination, counsel for Father asked Kamryn whether she met with counsel for Mother prior to coming to court. Kamryn stated that she met with Mother's counsel at her office prior to the July 5 court date, before court on July 5 (when the

- 16 -

hearing was continued), and before court the day of the hearing. Counsel for Mother went over the questions she would ask. Kamryn stated that Mother first talked to her about changing custody and moving to Dade County a week before the July 5 hearing date and had not talked to her about it since then.

Kamryn stated that Father told her her glasses looked cute on her. When he spanked her, he often told her he was sorry he had to do it. She testified that she liked to watch scary movies.

Kamryn admitted that she had discussed with Mother the darkness of her room at Mother's house. There had been times in the past when she was scared to stay down in the room. If something went wrong, she would have to go upstairs or go through a door and then out the garage door to get out of the house.

3. Kendyl

Kendyl, the other eleven-year-old twin, testified that, after the July 5 hearing, there was a family meeting at Father's house. The children were told that Father and Stepmother were not "the ones that were doing all of this. It was my mom that was making us go to court and making us switch schools and everything." Father and Stepmother also said that Father and Stepmother "could go to jail and that my little brother and sister could be taken away."

Asked about discipline at Mother's house, Kendyl stated that the children were usually grounded, sent to their room, or required to do chores. Mother might spank her "a little." The last time Mother spanked her was "a long time ago." At Father's house, Kendyl stated, the children were usually grounded, required to do chores, or spanked. Spankings were done with a switch, a hand, a belt, a flyswatter, or a hairbrush. Stepmother had hit Kendyl with a hairbrush. Spankings were usually on the butt or upper leg.

Kendyl acknowledged that Stepmother and Father had smacked her in the mouth or face. She testified that Stepmother had picked her up by her throat since August of 2012. She remembered this happening when she pushed Zander off of her bed. Kendyl recalled that Kamryn was spanked at vacation Bible school that summer.

Kendyl testified that they had a dog named Chaos at Father's house. Stepmother got mad at the children "and threw the dog outside in his crate and said that we couldn't have him anymore." Stepmother eventually brought the dog back in the house. The dog limped for a few days.

Kendyl stated that Father sometimes grabbed her chin forcefully to get her attention. This sometimes hurt. Once when he was spanking Zander with a belt, Father said that his father used to spank him with the metal part of the belt.

Asked about her Halloween costume for that year, Kendyl testified that she and Mother bought a tutu, tights, a shirt, hair spray, goggles, and face paint for her to be a purple minion. When she took the costume to Father's house, Stepmother would not allow her to wear it. Stepmother "put it in a bag, and she bought me some overalls and some purple face paint and hair spray so she could do my makeup and everything." Kendyl stated that she wanted to wear the costume that Mother got for her. Stepmother said she did not like the costume and that "it did not look like a purple minion at all." Kendyl and Mother had picked it all out. Stepmother took a picture of all of the costume parts and showed the picture to people whom Kendyl did not know. Stepmother told them: "Look at this purple minion costume that [Mother] made. It does not even look like a purple minion."

Kendyl testified that she sometimes went to her stepsister Alyssa's ball games and that Stepmother told her she "should be going to Kamryn's game, because Kamryn is my real sister, instead of Alyssa's." After court on July 5, Kendyl testified, Father asked Kamryn if she was scared of him.

Kendyl stated that she had a good relationship with Stepfather. She described activities similar to those included in Amaya's testimony.

Asked about the daytime schedule during the week, Kendyl testified that Stepmother's mother "treats us [the girls] like she likes Brionna and Zander more." The three girls would get in trouble, while Stepmother's mother was "always like petting and loving" on Brionna and Zander. When Stepmother came home, the girls would get in trouble with her for what went on during the day; they would try to explain to her what actually happened, but she would not listen most of the time, according to Kendyl.

Kendyl corroborated Amaya's testimony regarding the incident when Stepmother kicked in the bedroom door. As to the dresses Mother bought the twins for homecoming, she stated that "the rhinestones got picked off of them, and [Stepmother] said she didn't like it because of that." Stepmother bought them new dresses.

On cross-examination, counsel for Father asked questions about how many times Kendyl had met with Mother's attorney. Kendyl said they had met three times and reviewed the questions.

Kendyl described a time when she and Stepfather were practicing softball and her back began to bother her. Stepfather kept wanting to do more pitches after Kendyl told him her back was bothering her.

### 4. Stepfather

Stepfather testified that he and Mother lived in Trenton, Georgia and that he had two children of his own, Kylee, age seventeen, and Alyssa, age twelve. These two children spent the majority of their time with Stepfather and Mother because Stepfather had primary custody.

Stepfather purchased his home in June 2004. He worked at Astec Industries as a draftsman; he created design drawings of asphalt plant equipment. Prior to that job, Stepfather worked on the Watts Bar nuclear completion project for four years; he worked for a TVA contractor. Stepfather had three associate's degrees. His current salary was $57,000 a year. He and Mother had a joint checking account and used both of their incomes to pay household expenses.

Stepfather and Mother's relationship began at the end of 2012, when they started dating. He described them as being a good team. Stepfather testified that he had a good relationship with Amaya, Kamryn, and Kendyl. He tried "to treat them just like I do my kids." They did things together, like going out to eat, going to movies, watching movies at home, playing softball, and riding bicycles.

Questioned about discipline in their home, Stepfather testified that Mother corrected the children, "usually verbally." Stepfather did not discipline Mother's children and Mother did not discipline Stepfather's children "unless it's something that needs to be dealt with immediately." Stepfather stated that he had never spanked the girls.

Stepfather testified that he "would really like that" if the girls lived primarily at his and Mother's house. He stated that "usually Amaya is not really thrilled about going back" to Father's house. He had seen her crying when she had to go back.

After Stepfather testified, Mother returned to the stand and presented testimony in support of her proposed parenting plan.

### 5. LaJuana Layne

Father's Mother, LaJuana Layne, testified as the first witness for Father. She stated that Father and Stepmother were good parents and were raising responsible children. She had witnessed Father and Stepmother helping the children with their homework.

6. Father

Father was the final witness, and he testified that he lived in Jasper, Tennessee in the same house where he had lived when he was married to Mother. He introduced pictures of the house, the bedrooms, the bathroom, and the yard.[4]

Father had been employed at Shaw Industries in South Pittsburg, Tennessee as a lead over two departments for nine years and four months. Father made $20.46 an hour. Before that job, he worked for Mueller Company in Chattanooga.

Asked to explain his current work schedule, Father stated that he normally worked 36 hours one week and 48 hours the next week. During a normal year, Father stated, he worked six months out of the year.[5] His compensation had gone up since the last hearing. There were three applicable pay rates, depending upon the shift he worked, as well as an overtime rate. In 2012, Father made $47,329; in 2013, $43,006.05; in 2015, $51,695.75. Father's wife, Stepmother, was employed at Covenant Transport as a payroll coordinator.

Father had two children with Stepmother, Brionna, age six, and Alexander, age five. Father described a typical day as follows:

> A typical day, it depends on whether I'm working or not working. A workday, me and my wife get up. We get ready. We get our children ready, all of them, for school. One of us will take them to my mother's at the school where she works, and she will watch them until it is 7:00 until she takes them to school.
> Once out of school, my mother will pick them up, take them back to my home where they stay, play until one of us comes home from work. Then we cook dinner. Usually also, too, they're fed, you know, if they want before they go. If not, they're allowed to eat at school. And then once they're home, dinner is made, baths are done, teeth are brushed, and it's wind down time, ready for bed.

When Father was not working, he testified, he would take the children to school and take care of them after school.

---

[4] On cross-examination, Father testified that the three girls shared a bedroom and that the house had one and one-half bathrooms for seven people.

[5] Later, Father testified that, for example, on the week of January 3, the A shift would work Sunday, Wednesday, and Thursday (three days). Then, on the week of January 10, the A shift would work Monday, Tuesday, Friday, and Sunday (four days). Father concluded: "Breaking that down, I work seven days in a two-week period; therefore, I work six months out of the year, by this schedule."

When asked if there were additional support people nearby, Father testified that his mother was a cafeteria manager at Jasper Elementary, where his two youngest children went to school, and his aunt also worked in the cafeteria. His mother was able to bring the children home if they were sick. Stepmother's mother (or her husband) would come to their house and take care of a sick child.

Father testified that Mother had made no attempts or requests of him to take the children to doctors' appointments. He stated that, over the years, he had tried to make her aware of most of the children's appointments. Her response was usually, "Okay. Great. Glad you could get them in, just things of that nature."

Father testified that all three girls were "doing excellent" in school. They were all members of the Beta Club and had maintained 90 or above averages over the past year. Kendyl was on the principal's honor roll all year, Kamryn had been on the star honor roll, and Amaya had been on the honor roll.

Father testified and introduced pictures regarding vacations and fun activities enjoyed by his family, including the girls.

The following testimony occurred in response to questions regarding Father's and Stepmother's discipline:

> Q. Have you or your wife ever threatened the children?
> A. Yes, sir, on many occasions, but it's not to the extent of what the allegations are. It's more like you need to clean your room or you're going to be in trouble or, you know, you need to make sure that you've got all your homework done or you won't be able to go outside, small threats of that nature.
> Q. Have you or your wife slapped the children?
> A. Slapped the children, no. I have—well, yes. I have popped them in the mouth if they have had a smart remark or said a word that wasn't appropriate.
> Q. Demonstrate for the Court what we're talking about.
> A. Just a (indicating), just a small tap to get their attention to know that they have done something they shouldn't have.
> Q. Have you ever observed your wife choking the children?
> A. No, sir, I've never seen that.
> Q. Have you ever observed your wife jabbing the children in the throat?
> A. No, sir.
> Q. Have you or your wife ever spanked the children?
> A. Yes, sir.

Father testified about the eye-poking incident as follows:

Q. And would you tell His Honor what happened?
A. We were at White Water and Six Flags, Six Flags White Water in Atlanta, Georgia. Me, myself, all the children, all five of the children were having a day there. And Kamryn had made a remark about something, and [Stepmother] reached back to talk to her and pull her closer. When she did, she poked her in the eye.
Q. Was that intentional, from your observation?
A. No, sir.

Father testified that his disciplinary methods were to sit down with the children first and talk to them about what they had done wrong. If that did not work, he would take something away, like television, a tablet, or outdoor time. They would have to sit on the couch without any distraction. Next, he would resort to threatening to take away things like ball games or school events. If all of those methods failed, he would use corporal punishment.

On cross-examination, Father acknowledged that, since August 2012, he and Stepmother had used other forms of physical discipline in addition to spanking with the hand on the bottom. He admitted popping them in the mouth.

Father admitted that, on July 5, all parties were restrained from discussing the case with their children. He admitted that there was a family meeting at his house, at which he was present, and that the children were told that Father and Stepmother could go to jail and that Brionna and Zander could be taken away from them. Father stated that he was there for the meeting but that he "did not discuss anything with my children." He acknowledged that he permitted Stepmother to make the statements in his presence. Father also admitted that the restraining order ordered the parties not to spank their children and that, after the entry of the order, Father spanked Kamryn (during the time of vacation Bible school).

In response to cross-examination regarding his statement that he worked six months out of the year, Father admitted that he worked every week unless he was on vacation. He consistently worked overtime. Father further acknowledged that, in 2012, he was working the night shift, from 11:00 p.m. to 7:00 a.m., whereas he was currently working 7:00 a.m. to 7:00 p.m. Thus, Father was not at home during the daytime when he worked. While he and Stepmother were at work, his mother and Stepmother's mother took turns watching the children.

Father testified that Mother had never asked to have the children with her when he was not available during the week. He admitted that she had asked to take the children to ball practices and games when it was not her day. He further stated that Mother had asked about Kendyl playing summer ball on Amaya's team, saying that she would buy

the uniforms and take them to practice. Father would not agree; he believed his family had "plans that would compromise their ball team."

Counsel for Mother asked why Stepmother was not going to testify. Father stated that Stepmother had just gotten a new job and that "her work won't allow her to miss in her probationary period."

As to the dental appointment when Amaya had a root canal, Father denied that he and Stepmother prevented Mother from going back to see Amaya. Father claimed that Stepmother went back with Mother's permission. He acknowledged that Mother wanted to go back and see Amaya. As to the large gap between Amaya's front teeth, Father stated that he saw no need for her to see an orthodontist, although he agreed there was a gap there.

Father admitted that Amaya had not had her teeth cleaned since April 2014 and Kendyl had not had her teeth cleaned in a couple of years. Father took Kendyl to the dentist the week before the previous hearing and she had three teeth pulled. Kamryn went to the dentist in 2015 but did not have her six-month cleaning or checkup; dental records showed severe gingivitis.

As to Amaya's reading glasses breaking in fifth grade, Father admitted that he had not replaced the glasses in almost three years. He stated that, at her optometrist appointment, the optometrist said she had a mild prescription and "really didn't need glasses for anything other than distance." According to Father, at that time, Amaya wore glasses primarily for distance, although she currently wore them for reading. In almost three years, Father had not taken her back to get her eyes checked again.

Father admitted that he made the decision for the girls to get the HPV vaccine without consulting Mother. He further admitted denying Amaya permission to attend tutoring for the TCAP without consulting Mother.

Father requested that the court continue in effect the 2009 permanent parenting plan or award him even more parenting time.

Trial court's ruling

The trial court entered a memorandum opinion and order on September 15, 2016 setting forth the factual background of the case and addressing the issues presented. The court did not "find Father in contempt by a preponderance of the evidence." The court found that there had been a material change in circumstances since the 2009 parenting plan, but it concluded that it was in the children's best interest for Father to remain the primary residential parent. The trial court then made its ruling regarding the parenting

- 23 -

schedule. We will discuss the details of the trial court's decision as part of our analysis of the issues on appeal.

Mother filed a Rule 59 motion to alter or amend and then an amended Rule 59 motion to alter or amend. The trial court denied her motion to alter or amend on December 1, 2016. Mother appealed to this court.

STANDARD OF REVIEW

Our review is de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012). A trial court's determinations of whether a material change in circumstances has occurred and where the best interests of the children lie are factual issues. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Appellate courts must, therefore, presume a trial court's factual findings on these matters are correct and not overturn them unless the evidence preponderates to the contrary. *Armbrister*, 414 S.W.3d at 693.

Furthermore, as our Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

*Id.* Trial courts have broad discretion to work out the details of parenting plans. *Id.* A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

ISSUES ON APPEAL

Mother raises the following issues on appeal: (1) whether the trial court erred in failing to designate her as the primary residential parent or, in the alternative, to modify the parenting schedule to give her more parenting time; (2) whether the trial court erred in failing to find Father in contempt; (3) whether the trial court erred in failing to order

that the restraining order remain in effect; (4) whether the trial court erred in failing to award Mother her attorney fees, expenses, and costs; and (5) whether Mother is entitled to her attorney fees, costs, and expenses on appeal.

ANALYSIS

I.      Primary Residential Parent

Determining whether to change the primary residential parent requires a two-step analysis. *See* Tenn. Code Ann. § 36-6-101(a). The first step is to determine whether a material change of circumstance has occurred since the court's previous custody order. Tenn. Code Ann. § 36-6-101(a)(2)(B); *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007). If the trial court finds that there has been a material change in circumstances, the court must determine whether it is in the child's best interest to modify the parenting plan as requested. *Armbrister*, 414 S.W.3d at 705; *Boyer*, 238 S.W.3d at 259.

A material change in circumstance for purposes of modifying the residential parent is "'a distinct concept'" from a material change in circumstance for purposes of modifying the residential parenting schedule. *Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015) (quoting *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). A different statutory provision applies to each circumstance. *See* Tenn. Code Ann. §§ 36-6-101(a)(2)(B), -101(a)(2)(C). Where the issue before the court is a modification of the parenting schedule only, the threshold for determining whether there has been a material change of circumstances is "much lower" as compared to the threshold for modification of the primary residential parent. *Burnett*, 2015 WL 5157489, at *6. To modify the residential parenting schedule, a showing that the current schedule is not workable for the parties can be enough to satisfy the material change of circumstances standard. *Id.* (citing *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006)).

In the present case, the court applied the wrong standard in making its determination regarding whether there had been a material change in circumstance. Mother sought to become the children's primary residential parent. Thus, the appropriate statute is Tenn. Code Ann. § 36-6-101(a)(2)(B), which provides as follows:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation

or circumstances that make the parenting plan no longer in the best interest of the child.

Instead of applying this standard, the trial court relied upon Tenn. Code Ann. § 36-6-101(a)(2)(C), the provision applicable to a material change in circumstance for purposes of changing a residential parenting schedule only. To support its determination that there had been a material change in circumstance, the trial court provided only the following findings:

> The Court finds the children's needs have significantly changed since the 2009 Parenting Plan was approved in that there now exists significant changes in the needs of the parties' three daughters. Since the 2009 Parenting Plan the daughters are now seven years older.

The trial court then proceeded to the best interest analysis and made its determination that Father should remain the primary residential parent.

We will apply the standard of Tenn. Code Ann. § 36-6-101(a)(2)(B) to the facts of this case to determine whether there has been a material change in circumstance to justify a change in custody since the last order of custody was entered in November 2012.[6] Because the trial court failed to make sufficient findings of fact, as specifically required by Tenn. Code Ann. § 36-6-101(a)(2)(B)(i),[7] this Court will "conduct its own independent review of the record to determine where the preponderance of the evidence lies, without presuming the trial court's decision to be correct." *Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *10 (Tenn. Ct. App. July 31, 2013) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002)).

The statute itself provides that a material change of circumstance necessary to change primary residential parent may include "failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Moreover, the change must be "one that affects the child's well-being in a meaningful way." *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *see also Galaway v.*

---

[6] "[A] change in circumstances is measured from the *final* order of custody under which the parties are operating." *In re M.J.H.*, 196 S.W.3d 731, 742 (Tenn. Ct. App. 2005); *see also In re Teven A.*, No. M2013-02519-COA-R3-JV, 2014 WL 7419292, at *4 (Tenn. Ct. App. Dec. 29, 2014). In this case, the last final order of custody was entered on November 29, 2012, when the trial court denied Father's and Mother's petitions to modify and stated that the existing parenting plan, dated November 5, 2009, would remain in effect.

[7] Tennessee Code Annotated section 36-6-101(a)(2)(B)(i) provides: "In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination."

*Galaway*, No. M2015-00670-COA-R3-CV, 2016 WL 1291966, at \*3 (Tenn. Ct. App. Mar. 31, 2016).

Having closely reviewed all of the evidence, we find it sufficient to support a finding of a material change in circumstance based upon multiple factors that affect the children's well-being in a meaningful way, including changes in the parents' work schedules, Father's failure to comply with portions of the current parenting plan, and Father's lack of attention to the children's medical needs. Mother's work schedule is now flexible and allows her to be at home much of the time. Father's schedule changed so that he is usually not available during the day, and the children are cared for by their grandmothers, one of whom is not able to walk well and depends upon the girls to help her care for the girls' two younger half-siblings. As to the current parenting plan, Father has not included Mother in much of the decision-making regarding the children's medical care, education, and extracurricular activities, as he is required to do under the current parenting plan. In addition, Father failed to take the girls for regular dental check-ups, refused to take Amaya for evaluation by an orthodontist despite a gap between her two front teeth, neglected at least two of the girls' vision needs, and would not agree to take Amaya to a dermatologist for acne on her face, back, and neckline that caused her pain and embarrassment.

## II.    Best Interest

Once the trial court finds that there has been a material change in circumstances, it must then determine whether it is in the children's best interests to modify the parenting plan by considering the factors set forth in Tenn. Code Ann. § 36-6-106(a). *Cranston*, 106 S.W.3d at 644; *Masse v. Cottar*, No. M2015-00822-COA-R3-CV, 2016 WL 1120159, at \*6 (Tenn. Ct. App. Mar. 21, 2016). These factors include the following:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or

any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

As stated above, a trial court's determination as to whether modification of a parenting plan is in the children's best interest is a question of fact. *Armbrister*, 414 S.W.3d at 692. We presume that the trial court's findings of fact are correct unless the evidence preponderates against them. TENN. R. APP. P. 13(d). To preponderate against the trial court's findings of fact, the evidence "must support another finding of fact with greater convincing effect." *Austin v. Gray*, No. M2013-00708-COA-R3-CV, 2013 WL 6729799, at *6 (Tenn. Ct. App. Dec. 18, 2013). Furthermore, "findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary." *Williams*, 2013 WL 3927934, at *8.

With all of these principles in mind, we examine the trial court's findings regarding the statutory best interest factors:

Factor 1: The strength, nature, and stability of the child's relationship with each parent. The trial court found:

> [T]he children love their parents equally and are emotionally attached to both parents. Such is true even in light of the stress placed on them by their parents and the considerable bickering that goes on between Mother and Father and his wife Sonia. Father has been the primary caregiver for the children since 2006 when the parties separated and has provided the parenting responsibilities relating to the daily needs of the children during the last 10 years. This factor weighs heavily in Father's favor in the best interest analysis.

As the primary residential parent, Father performed more of the "parenting responsibilities relating to the daily needs" of the children. Because Father changed from working the night shift to working from seven a.m. to seven p.m., however, he has not been home during the day. Thus, his mother and Stepmother's mother have cared for the children while he and Stepmother were at work. Moreover, the evidence preponderates against the trial court's finding that there was "considerable bickering" between Mother and Father. The evidence at trial showed that Mother and Father rarely communicated and that Father generally responded to Mother's attempts at communication with shrugs or no response. (There was some testimony that Father and Stepmother bickered at times, but not typically in the presence of the children.) We, therefore, conclude that the trial court erred in weighing this factor heavily in Father's favor. This factor favors Father only slightly.

Factor 2:  Each parent's or caregiver's past and potential for future performance of parenting responsibilities.  The trial court found:

> Father has performed primary parenting responsibilities since 2006 thus his potential to perform basic parenting is good based on history.  Mother made an unsuccessful attempt in 2012 to gain primary parenting responsibilities. Since her marriage in 2014 she has endeavored to improve her standing for primary parenting.  The parties and Father's wife have had numerous incidents of confrontation, an example being a foolish argument over a Halloween costume as a result of Father's wife over-reacting.  Another incident involved an accidental striking of one of the girl's legs when Father's wife shoved open a door, to which Mother over-reacted.  In summary, the constant criticism by both sides of the other is detrimental to the best interest of the children and both parents must endeavor to lessen the stress level on their children and keep the children's well-being their primary focus.  The Court finds the proof evenly balanced and places no weight on this factor in the best interest analysis.

We disagree with the trial court's characterization of the facts and its analysis regarding factor two.  The focus of this factor is each parent's or caregiver's ability to perform parenting responsibilities, including the facilitation of the children's relationship with the other parent.  As will be discussed more fully below under factor four, Father has failed to provide necessary dental and eye care for the children.  The record does not support the trial court's finding that the Mother, Father, and Stepmother have engaged in "numerous incidents of confrontation."  There is no evidence of confrontations.  In the Halloween costume incident, Stepmother acted to undermine Mother and ridiculed the costume Mother and the child had picked out together.  Mother and the three children testified about other incidents when Stepmother and/or Father criticized Mother—for example, saying that she did not pay for anything, calling the children's room "a dungeon," and saying that their new glasses were ugly.  The weight of the evidence points to a pattern of negative statements by Father and Stepmother concerning Mother.

Factor two also states that "the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights." Every parenting plan includes a list of rights to which all parents are entitled pursuant to Tenn. Code Ann. § 36-6-101.  These rights include:  the right to unimpeded telephone conversations at least twice a week, the right to receive school records directly from the school, the right to receive medical records directly from the child's physicians, the right to be free of derogatory remarks, the right to 48-hour notice of extracurricular activities, and the right to access and participate in the child's education.  Mother testified that she could not receive school records without going to the superintendent, and she presented proof that Father and Stepmother had not provided her contact information to the girls' school.  Mother also testified that she could not get information from the children's

- 30 -

doctors and presented proof that her contact information was not listed on the office forms. She testified about an instance when Amaya was having dental surgery and she was not permitted to go back to the examining room; Father and Stepmother went back with Amaya. Father acknowledged in his testimony that he knew Mother wanted to be with Amaya. In addition, Mother testified that, when she talked to the girls on the telephone, Father or Stepmother was often nearby. Father did not testify to the contrary. Mother also stated that she missed school events and sports events because Father did not tell her about them.

Father also failed to honor the parenting plan's directive that the parties employ joint decision-making regarding the children's education, health care, religious upbringing, and extracurricular decisions. Father made health care decisions without consulting Mother (for example, to have the girls receive the HPV vaccine). Mother testified that Father would not allow her to take the children to doctor appointments because they occurred during the week (his parenting time). Father denied that Mother asked to take the children to medical appointments. Father admitted that he had not consulted Mother on decisions about the children's participation in sports.

Contrary to the trial court's characterization of the record, we find that the evidence supports a conclusion that Father and Stepmother show a propensity for excluding Mother from the parenting role in violation of the parenting plan and speaking about her to the children in a negative way. This factor weighs heavily against Father.

3. Factor 3: Attendance at parent education seminar. Not applicable.

4. Factor 4: The disposition of each parent to provide the children with food, clothing, medical care, education and other necessary care. The trial court found:

> [T]he parties are equally disposed to provide for the children but that Father has failed with some dental and eye care needs of some of their daughters. This factor weighs minimally in Mother's favor in the best interest analysis.

We agree with the trial court that Father has failed to provide the children with dental and eye care. Furthermore, the record shows that Father refused to take Amaya to the orthodontist despite a large gap between her two front teeth and refused to consult a dermatologist for acne on Amaya's face and back that did not respond to over-the-counter treatments. As to education, Father would not allow Amaya to attend free math counseling after school when she requested to do so. (Father did not consult Mother about this decision.) We conclude that the evidence preponderates against the trial court's finding that this factor should weigh only minimally in Mother's favor. We find that this factor weighs strongly in Mother's favor.

5. <u>Factor 5</u>: The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities. The trial court found:

> Father has been the primary caregiver for the children since 2006. This factor heavily favors Father in the best interest analysis.

We agree with the trial court that this factor favors Father because he has been the primary residential parent. Our courts recognize "'a strong presumption in favor of continuity of placement'" of a child. *Morris v. Morris*, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App. Sept. 17, 2002) (quoting *Hoalcraft v. Smithson*, 19 S.W.3d 822, 829 (Tenn. Ct. App. 1999)); *see also C.W.H. v. L.A.S.*, No. E2015-01498-COA-R3-JV, 2016 WL 6426731, at *15 (Tenn. Ct. App. Oct. 31, 2016).

6. <u>Factor 6</u>: The love, affection, and emotional ties existing between each parent and the child. The trial court found:

> The children equally love and have emotional attachment to both parents. This factor weighs in neither parent's favor in the best interest analysis.

We agree with the trial court that this factor weighs equally in favor of the two parties.

7. <u>Factor 7</u>: The emotional needs and developmental level of the child. The trial court found:

> Given the children are all females Mother would meet the emotional and developmental needs of the children better than Father. This factor moderately favors Mother in the best interest analysis.

We agree with the trial court's findings regarding this factor.

8. <u>Factor 8</u>: The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The trial court did not consider this factor. The record does not contain evidence that calls into question the fitness of either parent.

9. <u>Factor 9</u>: The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with his or her child's physical surroundings, school, or other significant activities. The trial court found:

> The children have two half-siblings in Father's home. In Mother's home are several children of her husband who are step-siblings. Mother has no

family living in the Trenton, Georgia area, however, her husband has relatives living in the area who have contact with the children. Father has relatives and his wife has relatives in the South Pittsburg area who have regular contact with the children. Father's mother and his wife's mother provide some babysitting on a regular basis for the children. The children have always attended Marion County Schools and have been involved in extracurricular activities in Marion County. Mother proposes to enter the children in school in Trenton, Georgia. This factor moderately favors Father in the best interest analysis.

In its findings regarding this factor, the trial court did not discuss the evidence regarding the relationships between the girls and their step-siblings and half-siblings. Mother put on proof that the girls had a close relationship with their step-sisters, Kylie and Alyssa, who are close to the girls in age. Father did not present any evidence regarding the relationship between the girls and their half-brother and half-sister, Xander and Brionna. The girls testified that Stepmother shows some favoritism toward Xander and Brionna and that, when Stepmother's mother babysits them during the week, the girls have to take care of the two younger children. The girls also testified that Stepmother's mother smokes around them when she babysits.

As part of Mother's proof, Stepfather testified. He stated that he and the girls spend a lot of time together, especially engaging in outdoor activities such as softball and biking. He does not use corporal punishment with the children.

The trial court did not address the girls' relationship with Stepmother at all. Stepmother did not testify. However, Mother and the three girls all testified concerning a number of incidents when Stepmother's relationship with the girls was problematic. Some examples of unpleasant incidents involving Stepmother include: when she threw the dog outside in its crate and it limped for a few days afterwards; telling one child she looked like a boy with her new haircut; calling Amaya a "crybaby" when Stepmother hit her with a door; and telling the children their glasses were ugly. Perhaps most notable is Stepmother's statement to the children after the July 5, 2016 court hearing that the conflict over the girls' custody was all the girls' fault because they were "stirring the pot" and that Father and Stepmother might go to jail and lose Brionna and Xander.

As the trial court correctly points out, the girls have always been in school in Marion County and involved in extracurricular activities there. They have a support system there. Amaya testified, however, that she had friends in Trenton, Georgia, where Mother lives, and would be open to going to school and getting involved in activities there. Despite the importance of continuity, the evidence of strife in the girls' relationship with Stepmother must not be ignored or discounted. This is a significant relationship in the girls' life that carries with it substantial stress for them. Taking all of

- 33 -

these facts into account, we conclude that this factor, regarding the family and physical environment, favors Mother.

10. Factor 10: The importance of continuity in the children's life and the length of time the children have lived in a stable, satisfactory environment. The trial court stated:

> Father has resided in the same home in South Pittsburg in which the children have resided since their infancy. Father has been employed at the same place for nine years. *Mother must rely on Mr. Wilson to provide a home for the children if she is decreed the primary parent of her children. Based on Mother's misleading 2012 testimony concerning her financial and marital stability and her demeanor in the present litigation, the Court finds Mother not to be a credible witness in regard to matters of financial and marital stability. This Court has considerable reservation about Mother's ability to provide a stable home for the children if she were the primary parent.* This factor heavily weighs in Father's favor in the best interest analysis.

(Emphasis added).

We agree that the continuity factor weighs in Father's favor, but we have some reservation concerning the trial court's credibility findings. We are to give a trial court's credibility findings great weight, and only clear and convincing evidence justifies overturning such findings. *Williams*, 2013 WL 3927934, at *8. Our concern stems from the trial court's reliance upon Mother's testimony at a hearing in 2012 for which the transcript does not appear in the record.

A trial court acts "within its discretion to consider its impression of both parties from the prior proceedings in the case, such as impressions of the parties' truthfulness or overall willingness to foster an amicable co-parenting relationship with the other parent." *Id.* at *13. In the factual section of its order, however, the trial court includes "facts" from the 2012 hearing:

> Mother testified at the 2012 hearing that she resided with her then husband, Mr. Reed, in Chattanooga and planned to move her three daughters into his home if granted primary physical custody. She testified her marriage was financially and emotionally sound.

The order from the 2012 hearing does not include these facts and, as stated above, the record does not contain a transcript of the 2012 hearing. Under these circumstances, we believe the trial court's reliance upon these "facts" was improper. *See id.* (stating that a court's "prior impressions cannot be the basis for a finding" that a parent violated a

- 34 -

parenting plan). Moreover, Mother testified that some of the "facts" included in the trial court's summary were incorrect. She stated that she owned the home where she and Mr. Reed resided.[8] In addition, Mother submitted evidence of a stable income and employment history during the trial of this case, and Father offered nothing to refute this evidence. We find no support for the trial court's "considerable reservation about Mother's ability to provide a stable home for the children."

With due deference to the trial court's ability to assess witness credibility, we conclude that this factor weighs only moderately in Father's favor.

11. Factor 11: Evidence of physical or emotional abuse. The trial court found:

> The Court finds Mother's proof exaggerated as to physical and emotional abuse of the children. Both parties' near constant arguing and bickering is equally abusive to the children. This factor weighs in neither parent's favor in the best interest analysis.

Again, there is no proof showing bickering between the parties. As we have discussed above, the proof shows Stepmother's behavior toward the girls to be unnecessarily harsh. We find no evidence of abuse.

12. Factor 12: The character and behavior of any other person who resides in or frequents the home. The trial court did not address this factor and we do not consider it relevant. (We have discussed Stepmother, Stepfather, step-siblings, and half-siblings previously.)

13. Factor 13: The reasonable preference of the child if twelve (12) years of age or older. The trial court found:

> The Court has heard the preference of the parties' oldest child, Candyce Amaya Phillips, to live with Mother. This factor moderately favors Mother in the best interest analysis.

We agree with the trial court's findings on this factor.

14. Factor 14: Each parent's employment schedule, and the court may make accommodations consistent with those schedules. The trial court found:

---

[8] Contrary to the trial court's conclusion that Mother was lying at the previous hearing, Mother explained that she declared bankruptcy after the 2012 hearing because of credit fraud committed by her mother. She also stated that she and Mr. Reed began experiencing marital problems during the 2012 litigation.

Mother has recently changed jobs and her present employment allows her to often be home. While there was conflicting proof regarding a change in Father's employment, the Court finds his hours are not significantly different than in the past. This factor moderately favors Mother in the best interest analysis.

The evidence preponderates against the trial court's finding that Father's "hours are not significantly different." According to the testimony of both Mother and Father, Father was working at night and was home during the day at the time of the trial in 2012. At the time of the hearing in 2016, Father was working from 7:00 a.m. to 7:00 p.m. on the days when he worked. Some confusion was created when Father testified: "I work six months out of a year." On cross-examination, Father acknowledged that (unless he is on vacation) he works every week, 36 hours one week and 48 hours the next week, and that he works overtime most weeks.[9] While Father and Stepmother are at work, Father's mother and Stepmother's mother take care of the girls and their two half-siblings.

We agree that this factor moderately favors Mother.

Considering all of these factors and their effect on the best interest of the three children, we conclude that the evidence preponderates against the trial court's finding that Father should remain the primary residential parent. The important factor of continuity favors Father, but the other key factors at play here are weighted in favor of Mother—namely, the changes in the parties' employment schedules, the children's stressful relationship with Stepmother and their positive relationship with Stepfather, the desire of the oldest child to live with Mother, Father's failure to attend to the children's dental, vision, and medical needs, Father's failure to comply with the current parenting plan, and the Father's and Stepmother's lack of willingness to facilitate and encourage Mother's relationship with the children.

II. Contempt

Mother further argues that the trial court erred in failing to find Father in contempt. Mother's petition for contempt prays that Father be punished for civil and criminal contempt. Conduct that does not occur in the presence of the court may not be punished as criminal contempt unless the proceedings comply with the requirements of Tenn. R. Crim. P. 42(b). *In re Brown*, 470 S.W.3d 433, 444 (Tenn. Ct. App. 2015). Rule 42(b) includes notice requirements that were not satisfied in this case.[10] Civil contempt is

---

[9] The origin of Father's statement about working six months a year seems to be that, under his "normal" work schedule (without overtime), he works three days (twelve-hour shifts) one week and four days (twelve-hour shifts) the next week.

[10] Tennessee Rule of Criminal Procedure 42(b) states, in pertinent part:

A criminal contempt shall be initiated on notice, except as provided in subdivision (a) of this rule.

- 36 -

"remedial and coercive in character, designed to compel a party to comply with the court's order." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006). We review a trial court's determination regarding civil contempt under the abuse of discretion standard. *In re Brown*, 470 S.W.3d at 442. We find no abuse of discretion in the trial court's decision not to find Father in contempt.

III. Attorney fees

Pursuant to Tenn. Code Ann. § 36-5-103(c), we grant Mother's request for an award of her reasonable attorney fees at trial and on appeal. *See Eberbach v. Eberbach*, No. M2014-01811-SC-R11-CV, --- S.W.3d ---, 2017 WL 2255582, at *5 n.5 (Tenn. May 23, 2017).

CONCLUSION

The judgment of the trial court is reversed, and we decree that Mother is the primary residential parent. This matter is remanded to the trial court for further proceedings consistent with this opinion. All restraining orders entered by the trial court shall remain in effect until dissolved by the trial court. Costs of this appeal are assessed against the appellee, Patrick Shane Phillips, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

(1) *Content of Notice*. The criminal contempt notice shall:
(A) state the time and place of the hearing;
(B) allow the alleged contemner a reasonable time to prepare a defense; and
(C) state the essential facts constituting the criminal contempt charged and describe it as such.
(2) *Form of Notice*. The judge shall give the notice orally in open court in the presence of the alleged contemner or by written order, including an arrest order if warranted. The notice and order may also issue on application of the district attorney general, an attorney appointed by the court for that purpose, or an attorney representing a party in the case.